**IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF ALABAMA
NORTHERN DIVISION**


**SHERRI L. DAVIS; et al.**                                          **PLAINTIFFS**

**VERSUS**                       **CIVIL ACTION NO. 2:06-CV-187-WKW**

**TMA FOREST PRODUCTS GROUP; et al.**               **DEFENDANTS**


**PLAINTIFFS' RESPONSE TO
DEFENDANTS' MOTION TO DISMISS**


COME NOW the Plaintiffs in the above-styled action and respond to the Rule 12(b)(6) motions to dismiss and Rule 12(e) motions for more definite statement filed by the defendants.


**Introduction and Overview**


The Plaintiffs sustained personal injuries as a result of exposure to hazardous substances released into the environment from Defendant's wood treatment facility in Covington County, Alabama (hereinafter the "Releasing Facility"). The Releasing Facility is located in the town of Lockhart adjacent to the town of Florala, Alabama.

Prior to purchase by Louisiana Pacific Corporation (L.P.) in November, 1983, the facility was owned and operated by PACTIV Corporation or their predecessor. Both companies maintained the same environmental controls, or lack thereof, the same local management and operated the facility in essentially the same manner by pressure treating lumber and pine wood poles with creosote, pentachlorophenol (PCP), copper chromium arsenate and other hazardous substances. L.P. discontinued use of PCP because, among other reasons, industrial PCP is heavily contaminated with dioxins, another extremely toxic chemical. The Releasing Facility occupied approximately 20 acres for their operation, lumber storage and as a waste dump. The facility produced much of its own energy by use of wood fired steam boilers, which they also used to illegally dispose of hazardous

waste.

The defendants operated the Releasing Facility in a manner that was in pronounced defiance to even the mildest environmental laws and standards, and as a result their operations, they continuously exposed the communities of Lockhart and Florala, over many years, to significant air emissions consisting of a multitude of recognized carcinogenic chemicals specifically identified by the United States Environmental Protection Agency as "Hazardous Substances." As a result of the manner of operation of the Releasing Facility, defendants released significant levels of hazardous substances into the environment, both air and groundwater, through the daily operation of steam boilers, teepee burners, evaporation vats, waste treatment ponds, and an outdated spray evaporation apparatus that routinely sprayed thousands of gallons of dioxin and arsenic contaminated water directly into the air near residential neighborhoods. The defendants' disposal practices involved unapproved onsite burial and direct burning of hazardous substances of sludge collected from the waste treatment pond. In spite of warnings by Alabama Department of Environmental Management (ADEM), defendants secretly injected toxic wastes into boiler smoke exhaust (*Affidavit of John "Buck" Roberts*, Exhibit "A"). Finally, the defendants sold contaminated wood scraps to individual citizens for household burning, thereby indirectly releasing even more of the hazardous substances into the environment.

Much information comes from individual citizens of the communities of Lockhart and Florala, including former employees of the defendants. The stories they tell are corroborated by documents obtained from the U.S. Environmental Protection Agency, the Alabama Department of Environmental Management, and former employees of the defendants. (See *Affidavit of former facility manager Roy Ezell*, Exhibit "B".)

The regulatory history of defendants' violations of environmental regulations and laws exceeds Ten Thousand pages. Although there were accidents or a few one time occurrences that contributed to defendants' release of hazardous substances, the contamination of Lockhart and Florala was caused by a multitude of acts or omissions that occurred on a daily basis for decades. For instance; former employee, Jacky Partridge, tells that the ashes from boiler fires that contained hazardous substances that were not released into the air, were dumped on a daily or weekly basis on the back of the facility property until the facility ceased operation in 1997 (see *Affidavit of Jacky*

*Partridge*, Exhibit "C"). Thousands of pounds of toxic chemicals were released into the air by this dust's ability to be transported significant distances by the wind and this process continues today.

Continuing exposure by wind has contributed to blood dioxin levels that remain as high as an experienced environmental chemist has ever seen. (See *Affidavit of Dr. Paul Rosenfeld*, Exhibit "D".) The bodies of most all of the people who live in proximity to the facility are so contaminated that they qualify for disposal at hazardous waste facilities. Homes in the area exceed the EPA recommended relocation threshold as much as 100 times. The entire community is ravaged with cancer and serious diseases. Childhood cancer is common.

Plaintiffs' allegations are based on (a) documents obtained from the Alabama Department of Environmental Management and the U.S. Environmental Protection Agency, (b) the testimony, in the form of affidavits, obtained from former employees of the defendants, and (c) expert testimony, in the form of affidavits, obtained from Thomas M. Nolen, M.D., F.A.A.F.P. and Paul Rosenfeld, Ph.D. ***These documents and testimony establish systematic and pervasive illegal conduct by the defendants***.

The Plaintiffs were exposed to hazardous substances that the defendants released into the environment from the Releasing Facility, which caused the Plaintiffs to develop cancer years after the facility closed. At no time did the Plaintiff have reason to know that exposure to these hazardous substances would cause these physical injuries (Exhibit "E" *Plaintiffs' affidavits*). There "was nothing in the Plaintiffs' medical records or apparent to them, based on a review of their medical records, that would have caused Plaintiffss to know the connection between their diseases and the exposure to hazardous substances unknown to them." Exhibit "F", the *Affidavit of Thomas M. Nolen, M.D., F.A.A.F.P.*, ¶ 10, p. 4.

In September, 2004, the Plaintiffs' counsel sent a demand letter (Exhibit "G") to the defendants which, after an opportunity to exchange information, was supplemented by a second demand letter, (Exhibit "H"). The demand letter identified individuals represented by counsel, including the Plaintiffs, and described their exposure histories, diseases, and other information. Defendants agreed to toll the statute of limitations for the claims of Plaintiffs during informal discovery. Ultimately mediation was scheduled and took place in the office of John Bickermann, Esq. in Washington, D.C. Unsatisfied with the mediation, defendants terminated the mediation, and

on January 30, 2006, Plaintiffs' counsel began filing lawsuits.

**Defendants' Motion for More Definite Statement Should Be Denied**

Defendants seek to dismiss Plaintiffs' complaint or in the alternative, for a more definite statement. Defendants refer to Plaintiffs' complaint which consists of 167 concise numbered paragraphs as a shotgun pleading. Federal Rule of Civil Procedure 8(a)(2) requires that a complaint contain "a short and plain statement of the claim showing that the pleader is entitled to relief," and a motion for more definite statement is proper under FRCP 12(e) only if a pleading "is so vague or ambiguous that a party cannot reasonably be required to frame a responsive pleading..." The defendants cite cases in which pleadings were unintelligible to support their position that Plaintiffs' complaint is a shotgun pleading. The complaint speaks for itself and bears no relationship to the pleadings which were described in defendants' citations. L.P. states to the Court: "In fact, Louisiana-Pacific does not even know what injuries allegedly occurred." The parties agreed to keep the material exchanged in preparation for mediation confidential and it should remain that way; but after an exchange of enough medical records to fill a large truck, execution of blank release forms and an answer to hundreds of questions propounded to each Plaintiff, L.P. exceeds the bounds of good faith argument to make such a statement.

Plaintiffs' complaint provides defendants much more particularity and factual detail than the Rules of Federal Procedure require. The U.S. Supreme Court has refused to consider, even well reasoned, arguments that would begin to revert our system back to the common law pleading requirements which were abandoned in the mid twentieth century and replaced with liberal discovery rules. The Supreme Court has unanimously and consistently ruled that the Rule means exactly what it says: "The Federal Rules of Civil Procedure do not require a claimant to set out in detail the facts upon which he bases his claim. To the contrary, all the Rules require is a 'short and plain statement of the claim' that will give the defendant fair notice of what the plaintiffs' claim is and the grounds upon which it rests." The only exceptions are averments of fraud or mistake. _Leatherman v. Tarrant Count Narcotics Intelligence and Coordination_, 507 U.S. 163 (1993) at 168 quoting _Conley v. Gloson_, 355 U.S. 41 (1957).

**The Statute of Limitations Is An Affirmative Defense;
Therefore It Should not be Subject to a Motion To Dismiss in This Case**

A defense that claims are barred by a statute of limitations is an affirmative defense, and the defendants have the burden of establishing the defense.  In the case of *Ex Parte Dan River, Inc*., 794 So.2d 386 (Ala. 2000), citing *Ellis v. Black Diamond Coal Mining Co.*, 265 Ala. 264, 267, 90 So.2d 770, (1956), the Alabama Supreme Court stated:

> ... the statute of limitations is an affirmative defense.  Therefore, the burden was on [defendant] to show that [plaintiff] had not been exposed to the materials for more than two years before the filing of the complaint.  "It is not necessary for the plaintiff to anticipate [the affirmative defense of the statute of limitations] and plead facts in avoidance thereof."

Consequently, the Plaintiffs' claims may not be dismissed on the defendants' motions under Rule 12(b)(6) unless the defense appears clearly on the face of the complaint.  *Culver v. Lang*, 2006 WL 73732 (Ala. Civ App.).  The Federal Rules of Civil Procedure yield the same result.  *Harrison v. Thompson*, 447 F.2d 459 (5th Cir. 1971).

**The Plaintiffs' Claims Are Not Time-Barred:
CERCLA Section 309 Preempts Alabama Law**

The Plaintiffs' claims are not time-barred because they did not accrue until the Plaintiffs knew or reasonably should have known that the Plaintiffs' physical injuries were caused by exposure to the hazardous substances released into the environment from the Releasing Facility.

The federally required commencement date mandated by CERCLA, Section 309, clearly applies to state law claims arising out of exposures to hazardous substances released from a wood treatment facility.  *Tucker v. Southern Wood Piedmont Company*, 28 F.3d 1089, 1091 (11th Cir. 1994).  *Tucker, supra*, is a white horse case.

Section 309 of the COMPREHENSIVE ENVIRONMENTAL RESPONSE, COMPENSATION, AND LIABILITY ACT OF 1980 ("CERCLA"), 42 U.S.C. §§ 9601, 9658, amends state statutes of limitations governing personal injury actions arising out of exposure to any "hazardous substance" or "pollutant or contaminant" "released" into the "environment" from a "facility," as those terms are defined by

CERCLA. Under Section 309,[1] the state statute of limitations continues to be applicable,[2] but a federally required commencement date ("hereafter sometimes referred to as FRCD") based on discovery of the cause of action[3] is substituted for the accrual date under the state statute, if it is earlier.[4] The FRCD preempts not only the applicable accrual rule, but also Alabama's rule of repose. *Morgan v. Exxon Corporation*, 869 So.2d 446 (Ala. 2003).

In applying section 309, a court should bear in mind that CERCLA is a remedial statute that should be construed liberally in order to effectuate its goals. *U.S. v. Alcan Aluminum Corporation*, 964 F2d 252 (3rd Cir. 1992), *rehearing en banc denied*.

## Facility

The Releasing Facility is a "facility" as that term is defined by CERCLA. The term "facility" is defined by 42 U.S.C. § 9601(9), as follows:

The term "facility" means (A) any building, structure, installation, equipment, pipe or pipeline (including any pipe into a sewer or publicly owned treatment works), well, pit, pond, lagoon, impoundment, ditch, landfill, storage container, motor

---

[1]. Section 309 was added by the SUPERFUND AMENDMENT AND REAUTHORIZATION ACT OF 1986 ("SARA"), (codified as amended in scattered sections of the UNITED STATES CODE).

[2]. "Except as provided in paragraph (1), the statute of limitations established under State law shall apply in all actions brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility." 42 U.S.C. § 9658(a)(2).

[3]. "Except as provided in subparagraph (B), the term 'federally required commencement date' means the date the plaintiff knew (or reasonably should have known) that the personal injury or property damages referred to in subsection (a)(1) of this section were caused or contributed to by the hazardous substance or pollutant or contaminant concerned." 42 U.S.C. § 9658(b)(4)(A).

[4]. "In the case of any action brought under State law for personal injury, or property damages, which are caused or contributed to by exposure to any hazardous substance, or pollutant or contaminant, released into the environment from a facility, if the applicable limitations period for such action (as specified in the State statute of limitations or under common law) provides a commencement date which is earlier than the federally required commencement date, such period shall commence at the federally required commencement date in lieu of the date specified in such State statute." 42 U.S.C. § 9658(a)(1).

vehicle, rolling stock, or aircraft, or (B) any site or area where a hazardous substance has been deposited, stored, disposed of, or placed, or otherwise come to be located; but does not include any consumer product in consumer use or any vessel.

There can be "no room for doubt" that a wood treatment facility of the type operated by the defendants in this case is a "facility" within the meaning of CERCLA. *Tanglewood East Homeowners v. Charles Thomas, Inc*., 849 F.2d 1568, 1573 (5th Cir. 1988).

## Hazardous Substances

The substances to which the Plaintiffs were exposed are "hazardous substances" as that term is defined by CERCLA. The term "hazardous substances" is defined by 42 U.S.C. § 9601(14) as follows:

The term "hazardous substance" means (A) any substance designated pursuant to section 311(b)(2)(A) of the Federal Water Pollution Control Act [33 USCS § 1321(b)(2)(A)], (B) any element, compound, mixture, solution, or substance designated pursuant to section 102 of this Act [42 USCS § 9602], (C) any hazardous waste having the characteristics identified under or listed pursuant to section 3001 of the Solid Waste Disposal Act [42 USCS § 6921] (but not including any waste the regulation of which under the Solid Waste Disposal Act [42 USCS §§ 6901 et seq.] has been suspended by Act of Congress), (D) any toxic pollutant listed under section 307(a) of the Federal Water Pollution Control Act [33 USCS § 1317(a)], (E) any hazardous air pollutant listed under section 112 of the Clean Air Act [42 USCS § 7412], and (F) any imminently hazardous chemical substance or mixture with respect to which the Administrator has taken action pursuant to section 7 of the Toxic Substances Control Act [15 USCS § 2606]. The term does not include petroleum, including crude oil or any fraction thereof which is not otherwise specifically listed or designated as a hazardous substance under subparagraphs (A) through (F) of this paragraph, and the term does not include natural gas, natural gas liquids, liquefied natural gas, or synthetic gas usable for fuel (or mixtures of natural gas and such synthetic gas).

To be a "hazardous substance" for the purposes of CERCLA, a substance need only be designated as hazardous under any one of the four statutes listed above. *B.F. Goodrich Company v Murtha*, 958 F.2d 1192 (2nd Cir. 1992). The Plaintiffs have alleged – and the evidence

demonstrates – that the products of the defendants' operations included chemicals listed under all four statutes, which are listed and recognized as known human carcinogens, are hazardous substances within the meaning of CERCLA.

The Plaintiffs have not identified as hazardous substances in this case any petroleum, crude oil, or fraction thereof nor any natural gas, natural gas liquids, liquefied natural gas, synthetic gas usable for fuel, or mixtures of natural gas and synthetic gas, and so the petroleum exclusion is not applicable. Moreover, if the defendants intend to assert the benefit of the petroleum exclusion, they bear the burden of proof on that issue. _Tosco Corporation v. Koch Industries, Inc._, 216 F.3d 886 (10th Cir. 2000). There are no petroleum production facilities in the Lockhart area (Affidavit of Dr. Paul Rosenfeld, Exhibit B).

### Release Into the Environment

The hazardous substances to which the Plaintiffs were exposed were "released" into the "environment" as those terms are defined by CERCLA. The term "release" is defined by 42 U.S.C. § 9601(22) as follows:

> The term "release" means any spilling, leaking, pumping, pouring, emitting, emptying, discharging, injecting, escaping, leaching, dumping, or disposing into the environment (including the abandonment or discarding of barrels, containers, and other closed receptacles containing any hazardous substance or pollutant or contaminant), but excludes (A) any release which results in exposure to persons solely within a workplace, with respect to a claim which such persons may assert against the employer of such persons, (B) emissions from the engine exhaust of a motor vehicle, rolling stock, aircraft, vessel, or pipeline pumping station engine, (C) release of source, byproduct, or special nuclear material from a nuclear incident, as those terms are defined in the Atomic Energy Act of 1954 [42 USCS §§ 2011 et seq.], if such release is subject to requirements with respect to financial protection

established by the Nuclear Regulatory Commission under section 170 of such Act [42 USCS §§ 2210], or, for the purposes of section 104 of this title [42 USCS § 9604] or any other response action, any release of source byproduct, or special nuclear material from any processing site designated under section 102(a)(1) or 302(a) of the Uranium Mill Tailings Radiation Control Act of 1978 [42 USCS § 7912(a) or 7942(a)], and (D) the normal application of fertilizer.

The term "environment" is defined by 42 U.S.C. § 9601(8) as follows:

The term "environment" means (A) the navigable waters, the waters of the contiguous zone, and the ocean waters of which the natural resources are under the exclusive management authority of the United States under the Magnuson-Stevens Fishery Conservation and Management Act [*16 USCS §§ 1801* et seq.], and (B) any other surface water, ground water, drinking water supply, land surface or subsurface strata, or ambient air within the United States or under the jurisdiction of the United States.

These definitions of "release" and "environment" are so broad that they easily encompass the allegations of this case.

A release into the environment encompasses not only active conduct, such as "disposal," *U.S. v. CDMG Realty Company*, 96 F.3d 706 (3rd Cir. 1996), but also passive activity, such as "leaching." *Id*. at 715. Thus, a release into the environment "does not require active participation by any responsible parties," *Westfarm Associates Limited Partnership v. International Fabricare Institute*, 846 F.Supp. 422, 431 (D.Md. 1993), and a release into the environment has been found where waste material contained hazardous substances, there were piles of drums stacked up with some partially buried in a sinkhole, there were stained soils, strong chemical orders were perceived at the site, there were no stormwater runoff controls, and drums with waste materials were burned in open. *U.S. v. JG-24, Inc*., 331 F.Supp.2d 14 (D.P.R. 2004). Similarly, a finding of cyanide, lead, cadmium, and other hazardous substances at the site of an electroplating business, when combined with evidence that no party was willing to assert control of the hazardous substances, was found to constitute a release or threat of release of hazardous substances into the environment. *U.S. v. R.W. Meyer, Inc.*, 889 F.2d 1497 (6th Cir. 1989), cert. denied, 494 U.S. 1057 (1990).

## Underlying CERCLA Claim

The defendants assert that the federally required commencement date in section 309 is not applicable unless there is an underlying CERCLA claim for cleanup or remedial activities. In support of this assertion, the defendants cite *dicta* in *Becton v. Rhone-Poulenc, Inc*., 706 So.2d 1134 (Ala. 1997). *Becton*, however, concerned an individual whose personal injury was the result of an *occupational exposure*, which is expressly excluded from coverage under section 309.[5] Moreover, the court in *Becton* did not rule that an underlying CERCLA action was required, but merely cited four cases for the proposition that some courts have limited section 309 to cases in which an underlying CERCLA claim had been made *or could exist* based on the presence of hazardous waste. Clearly, an underlying CERCLA claim could be maintained against the defendants in this case. In addition, the four cases cited in *Becton* are all inapplicable to this case.[6]

In stark contrast to the *dicta* in *Becton*, it is clear that section 309 itself does not require an underlying CERCLA action, nor does the legislative history:

> There is nothing in the language of the section that requires an underlying CERCLA action in order to apply the federally required commencement date preemption of the state statute of limitations. The Congressional reports accompanying and explaining the legislation also makes no reference to an underlying CERCLA action.

_____

[5] The definition of "release" in 42 U.S.C. § 9601(22) specifically excludes "any release which results in exposure to persons solely within a workplace."

[6] Like *Becton*, two of the cases involved occupational exposures that are statutorily excluded from coverage under CERCLA. "The interior of a place of employment is not 'the environment' for purposes of CERCLA – at least to the extent employees are the injured persons – and § 309(a)(1) therefore does not apply to Covalt's claim." *Covalt v. Carey Canada, Inc*., 860 F.2d 1434, 1439 (7th Cir. 1988). "The decedent's work site would not qualify as a facility under CERCLA." *Knox v. AC&S, Inc*., 690 F.Supp. 752, 756 (S.D. Ind. 1988). One case is based on the statutory exclusion in 42 U.S.C. § 9604(a)(3)(B) that prohibits CERCLA removal or remedial action in response to a release "from products which are part of the structure of, and result in exposure within, residential buildings or business or community structures." *First United Methodist Church v. United States Gypsum Company*, 882 F.2d 862 (4th Cir. 1989), *cert. denied*, 493 U.S. 1070 (1990). Finally, one case involved a miniscule release from something other than a typical facility. "This Court does not believe that the leaking of a relatively small quantity of dielectric fluid from a damaged transformer, within the confines of a penthouse containing electrical equipment, is the type of 'release into the environment' contemplated or intended by the CERCLA." *Electric Power Board of Chattanooga v. Westinghouse Electric Corporation*, 716 F.Supp. 1069, 1081 (E.D. Tenn. 1988), *affirmed*, 879 F.2d 1368 (6th Cir. 1989), *cert. denied*, 493 U.S. 1022 (1990).

_Kowalski v. The Goodyear Tire & Rubber Company_, 841 F.Supp. 104, 107 (W.D.N.Y. 1994).

> The plain reading of § 9658 in the context of the mandate which resulted in the SARA amendments suggests that the preemption of a state statute of limitations was passed as an additional remedy, not one confined to actual CERCLA actions.

_Id_. at 108.

Thus, upon establishing that he has suffered damage caused by hazardous substances released into the environment from a facility, a plaintiff may invoke CERCLA's federally required commencement date and "need not have an underlying CERCLA action in order to seek damages under that statute." _Tower Asphalt, Inc. v. Determan Welding and Tank Service, Inc_., 530 N.W.2d 872, 875 (Minn.Ct.App. 1995).

### Application of Section 309

Under section 309, the instant cause of action did not accrue until the Plaintiffs knew or reasonably should have known that the injuries sustained were caused by the release of hazardous substances from the Releasing Facility:

> In applying the FRCD's "reasonably should have known" standard, courts apply a two-pronged test. First, they assess "whether a reasonable person in Plaintiffs' situation would have been expected to inquire about the cause of his or her injury." [_citation omitted_]. If the plaintiff was on inquiry notice, then courts consider whether such inquiry "would have disclosed the nature and cause of plaintiffs injury so as to put him on notice of his claim," and charge plaintiff with knowledge of facts that would have been discovered through that process.

_LaBauve v. Olin Corporation_, 231 F.R.D. 632, 659 (S.D. Ala 2005).

There is no evidence that the Plaintiffs either knew or reasonably should have known that the Plaintiffs' injuries were caused by exposure to hazardous substances released from the Releasing Facility more than two years prior to the filing of this lawsuit, and the defendants have failed to direct this Court's attention to any set of facts that would have placed the Plaintiffs on notice. The defendants conducted no community meetings, corresponded with no member of the community, and posted no signs advising of the danger and Plaintiffs' medical records and knowledge gave them no reason to know the cause of the disease (see _Affidavits of Dr. Tom Nolen and of Plaintiffs_,

Exhibits "F" and "E").  Consequently, there is no basis for concluding that the federally required commencement date occurred more than two years prior to the filing of this lawsuit, and the case was therefore timely filed.

## The Plaintiffs' Claims Are Not Time-Barred:
## Plaintiffs' Claims Are Timely Even Under Alabama Law

Even if this Court determines that section 309 is not applicable and CERCLA's federally required commencement date does not preempt Alabama law, the Plaintiffs' claims are nevertheless timely.

## Alabama's Rule of Repose Is Not Applicable

The defendants assert that Alabama's 20-year rule of repose commences when a defendant's conduct ceases, without regard to whether the Plaintiffs could bring a cause of action.[7]  This, however, is contrary to the law.  Alabama's 20-year rule of repose does not begin to run until the claims _could have been asserted_.  The rule of repose "begins running on a claim as soon as all of the essential elements of that claim coexist so that the Plaintiffs could validly file suit."  _American General Life & Accident Insurance Company v. Underwood_, 886 So.2d 807, 812 (Ala. 2004).  "The 20-year period begins to run against claims the first time those claims could have been asserted."  _Ex Parte Liberty National Life Insurance Company_, 825 So.2d 758, 764 (Ala. 2002).  The rule of repose "bars actions that have not been commenced within 20 years from the time they could have been commenced."  _Tierce v. Ellis_, 624 So.2d 553, 554 (Ala. 1993).  The rule "operates as an absolute bar to claims that are _unasserted_ for 20 years."  _Boshell v. Keith_, 418 So.2d 89, 91 (Ala.

---

[7].     Incredibly, the defendant cites as authority _Baugher v. Beaver Construction Company_, 791 So.2d 932 (Ala. 2000), a case that did not concern Alabama's judicially created 20-year rule of repose, but instead concerned the legislatively enacted statute of repose limiting actions against architects, engineers, and contractors.

1982), *emphasis added*.  This is because the rule is premised upon the concept that "it is inequitable to allow those who have slept upon their rights for a period of 20 years" to file suit.  *Snodgrass v. Snodgrass*, 58 So. 201, 202 (Ala. 1912).  Obviously, one cannot "sleep" on his rights until he has the right to commence an action.

Under applicable Alabama law, the Plaintiffs were never entitled to commence an action until the Plaintiffs had a "manifest, present injury" – i.e., suffered from a disease caused by exposure to the hazardous substances released from the Releasing Facility.  In *Thomas v. BSE Industrial Contractors*, 624 So.2d 1041 (Ala. 1993), the Alabama Supreme Court affirmed a summary judgment against a plaintiff that had been exposed to asbestos but had not developed any asbestos-related disease.  The plaintiff had been hired to install heaters by hanging them from insulated pipe, but no one had warned him that the insulation contained significant amounts of asbestos.  Because of this, the plaintiff did not wear any protective respiratory devices or protective clothing while working on the project.  Upon learning that he had been exposed to significant quantities of asbestos, the plaintiff in *Thomas, supra*, sued several defendants, asserting, "given the vast amount of medical evidence now available concerning the deleterious effects of asbestos, the actions of the defendants constitute 'extreme and outrageous' conduct."  *Id*. at 1044.  The court, however, ruled that the defendants' conduct "cannot be characterized as extreme and outrageous conduct," *id*. at 1045, and affirmed the summary judgment against the plaintiff.  In so doing, the court found that Thomas had not been injured by his exposure:

> Thomas presented no substantial evidence that he had suffered emotional distress so severe that a reasonable person could not be expected to endure it.  Thomas alleged in his complaint that he is afraid that he will contract cancer because of his exposure to asbestos, and he testified that he feels like a "walking time bomb."  These generalized apprehensions do not rise to the level of the extreme, severe emotional distress for which an action will lie, at least because *his apprehensions are not supported by any clinical indications that he has been injured by his exposure*.

624 So.2d at 1045, *emphasis added*.

Similarly, in *Hinton v. Monsanto Company*, 813 So.2d 827 (Ala. 2001), a plaintiff that had been exposed to polychlorinated biphenyls ("PCBs") but had not yet developed any disease[8] sued

---

[8]     "Hinton does not allege that he has sustained a physical injury or an illness as a result of his exposure to PCBs; rather, he seeks to recover the costs of medical monitoring he alleges is necessitated by that exposure.  He claims that

the PCB manufacturer for medical monitoring on behalf of a class of exposed individuals. Because the plaintiff had filed the case within two years after exposure, the timeliness of the complaint was not in question. Instead, the court was now considering whether an injury had occurred – a cause of action had accrued – sufficient to support a lawsuit. In an opinion authored by Justice Stuart, the Alabama Supreme Court declared that "Alabama law has long required a manifest present injury before a plaintiff may recover in tort." 813 So.2d at 829. In applying this principle, the court declared that although they had been exposed to PCBs, Hinton and the other class members had not yet been *injured*:

> The most striking aspect of Hinton's claim is the lack of a present physical injury or illness among the putative class members. Because the class members do not purport to have a present injury or illness, we are asked to determine whether exposure to a hazardous substance, without a present injury attributable to that exposure, gives rise under Alabama law to a cognizable claim for medical monitoring of the class members. As the question is phrased by the United States District Court, we are asked to determine whether Alabama law recognizes a distinct cause of action for medical monitoring in the absence of a manifest physical injury or illness. We answer the question in the negative.

813 So.2d at 828.

Because the Plaintiffs were not able under Alabama law to assert the claims in this case until the Plaintiffs had a "manifest, present injury," the 20-year period of the Alabama rule of repose also did not begin to run until that time, and the claims are therefore not time-barred under the rule of repose.

### Conduct Ending in the 1970's May Support A Current Claim

The defendants argue that a "last exposure" accrual rule applies to the Plaintiffs' claims against the defendants, and then simply *assume* that the last exposure occurred at the time the defendant ceased its activities at the Releasing Facility. This assumption, however, is not consistent

---

this need for medical monitoring constitutes a harm sustained by him and that this harm is a result of Monsanto's tortious act of releasing PCBs into the environment." 813 So.2d at 828.

with Alabama law, and not one of the cases cited by the defendants supports that assumption.  In *Payton v. Monsanto Company*, 801 So.2d 829 (Ala. 2001), the Alabama Supreme Court considered the timeliness of a case filed more than 20 years after the defendant had last manufactured the hazardous substances that caused the plaintiff's damages:[9]

> Monsanto had improperly discharged PCBs into Snow Creek at various times since the Anniston plant had opened and that even though Monsanto had ceased producing PCBs in the early 1970s, the PCBs from Monsanto's property are continuing to enter the water system that flows into Lay Lake.

*Id*. at 831.

The action was deemed to be timely because the court found that the continuing release of the PCBs into the water system constituted "conduct" that made the tort a continuing tort:

> While Monsanto has offered evidence suggesting that hazardous levels of PCBs were present in Lay Lake before the period of limitations applicable to this action based upon the discovery in the Comfort litigation, such evidence does not negate the allegations of Payton's complaint describing continuing discharge of PCBs as of the time of the commencement of this action.  Based on the previously stated rules of accrual of action, the complaint could survive a defense of limitations by proof of conduct occurring within the limitations period.

*Id*. at 836.

The defendants improperly incinerated hazardous substances and then scattered the contaminated ashes on the open ground at the Releasing Facility.  See Exhibit "C", *Affidavit of Jacky Partridge*, page 3.  As a result, hazardous substances continue to be released into the environment from the Releasing Facility:

> Because of this practice, and as a result of natural environmental events, including without limitation, wind, rain, storms, and other natural phenomena, elemental heavy metals, including arsenic, dioxins, polycyclic aromatic hydrocarbons, chromate-copper arsenate, and pentachlorophenol, would have continuously been released into the environment for many years after the Releasing Facility ceased operations.

Exhibit "D", *Affidavit of Paul Rosenfeld, Ph.D.*, page 7.

Thus, based upon the polluted condition in which the defendants left the Releasing Facility,

---

[9]  The lawsuit was filed on July 15, 1997.  801 So.2d at 836.

hazardous substances continue to be released into the environment even to this very day.  These hazardous substances have found their way into the homes and bodies of the citizens of Lockhart and Florala, including the Plaintiffs.  Exposure will continue unless defendants complete remediation of the contamination site that EPA has required.

### A Property Damage Claim Does Not Trigger a Personal Injury Claim

The defendants assert that the existence of property damage claims independently triggers the statutes of limitation for all claims, and in support of this proposition, they cite *Spain v. Brown & Williamson Tobacco Corporation*, 872 So.2d 101 (Ala. 2003), a case in which *no property damage claims were asserted*.  The sole claim asserted in *Spain* was a wrongful death claim, and nowhere in the opinion did the Alabama Supreme Court rule that the accrual of one cause of action triggers another.  Instead, what the court said was that the first *damages* suffered by a plaintiff in connection with a developing personal injury – even if they are purely economic damages – are sufficient to cause the accrual of that personal injury claim, even if the plaintiff does not yet suffer from a disease.  In *Spain* the Plaintiff's addiction to nicotine was deemed sufficient to constitute a legal injury, thereby triggering the statute of limitations, notwithstanding the fact that the Plaintiff suffered only economic damages at the time she became addicted to nicotine.  The Plaintiff's addiction to nicotine affected her body, not her property.  The contention that accrual of a cause of action for property damage triggers the accrual of an independent claim for bodily injury is simply without merit and without any supporting authority.

Moreover, the defendants in this case have not placed before this Court *any* facts that would even support their bald assertion that any propertyf damage claim held by the Plaintiffs accrued when the defendants say it did.

### The Plaintiffs' Complaint States Appropriate Causes of Action
### Causes of Action Underlying Personal Injury

The defendants assert that because the only cause of action available to the Plaintiffs is a

personal injury claim, Counts 1 through 8 of the complaint should be dismissed. This assertion assumes that Counts 1 through 8 are not personal injury counts. However, a close reading of those counts reveals that the damages alleged in each case is the personal injuries of Plaintiffs. It should be clear, then, that the Plaintiffs' complaint does assert personal injury claims, and that the individual counts are simply the underlying grounds for the personal injury claims.

## Count 3 – Negligence *Per Se*

In Count 3 of the complaint, the Plaintiffs properly assert a claim for "negligence per se" against each defendant because of the defendants' failure to report emissions containing hazardous substances that caused the Plaintiffs' injuries. Under Alabama law, the doctrine of negligence per se or negligence as a matter of law arises from the premise that the legislature may enact a statute that replaces the common-law standard of the reasonably prudent person with an absolute, required standard of care. When the legislature adopts such a standard, anyone who violates it and causes injury to a person that the statute intended to protect is liable for negligence per se. Proof of a violation of the statute is proof of negligence. *Parker Building Services Company, Inc. v. Lightsey*, 2005 Ala. LEXIS 92 (2005). To establish negligence per se, a plaintiff must prove: (1) that the statute the defendant is charged with violating was enacted to protect a class of persons to which the plaintiff belonged; (2) that the plaintiff's injury was of the kind contemplated by the statute; (3) that the defendant violated the statute; and (4) that the defendant's violation of the statute proximately caused the plaintiff's injury. *Dickinson v. Land Developers Construction Company, Inc*., 882 So.2d 291 (Ala. 2003).

In a case remarkably similar to the instant case, the Eleventh Circuit ruled that where evidence supports causation and resulting injury, a violation of the RESOURCE CONSERVATION AND RECOVERY ACT, 42 U.S.C. §§ 6901, et seq. ("RCRA") constitutes negligence per se. *Parker v. Scrap Metal Processors, Inc*., 386 F.3d 993 (11th Cir. 2004). To prevail on a claim under 42 U.S.C. § 6972(a)(1)(B), the plaintiff must prove: (1) that the defendant is a person, including, but not limited to, one who was or is a generator or transporter of solid or hazardous waste or one who was or is an owner or operator of a solid or hazardous waste treatment, storage, or disposal facility; (2) that the

defendant has contributed to or is contributing to the handling, storage, treatment, transportation, or disposal of solid or hazardous waste; and (3) that the solid or hazardous waste may present an imminent and substantial endangerment to health or the environment.

In *Parker*, property owners sued a scrap metal yard and its predecessors in interest, alleging, *inter alia*, violations of RCRA and the CLEAN WATER ACT, 33 USCS §§ 1251, et seq. ("CWA"). The court quoted with approval[10] a Ninth Circuit case in which the plaintiffs lived across the street from a landfill and alleged that the operators of the landfill violated RCRA:

> If the landfill is not run as required by RCRA, the Covingtons are directly confronted with the risks that RCRA sought to minimize: Fires, explosions, vectors, scavengers, and ground-water contamination, if such occur, threaten the Covingtons' enjoyment of life and security of home. Violations of RCRA increase the risks of such injuries to the Covingtons. Such risks from improper operation of a landfill are in no way speculative when the landfill is your next-door neighbor.

*Covington v. Jefferson County*, 358 F.3d 626, 639 (9th Cir. 2004).

Based on the Ninth Circuit's ruling in *Covington*, the Eleventh Circuit ruled that a RCRA violation resulting in damages to a plaintiff satisfied the injury-in-fact requirement and established causation:

> Here, Mrs. Parker's factual showing that the soil on her land was contaminated, that USTs were leaking, and that solid waste migrated onto the Parker property is sufficient to satisfy the injury-in-fact requirement.
>
> The defendants also challenge causation and redressability, arguing that any injury is not the result of a violation of the RCRA. The Parkers, however, recovered pieces of solid waste from the property and submitted these at trial. Such evidence shows likely violations of the RCRA by the defendants and, thus, the evidence shows causation. Finally, an injunction preventing the defendants from allowing such waste to migrate onto the Parker property would redress the injury.

386 F.3d at 1003.

The Plaintiffs have adduced substantial evidence in the form of fact and expert affidavits, EPA and ADEM records, attic dust and blood analyses, and documentary evidence of specific violations of the ALABAMA HAZARDOUS WASTE MANAGEMENT AND MINIMIZATION ACT

---

[10]. 386 F.3d at 1003.

("HWMMA"), ALABAMA CODE §§ 22-30-1, *et seq.* committed by the defendants.  As in *Parker* and *Covington*, such evidence clearly establishes the elements of negligence per se.

## Count 6 – Conspiracy

The thrust of Count 6 is that the defendants conspired together to violate RCRA, CERCLA, and HWMMA.  Under these statutes, the defendants had an *affirmative* and *continuing* duty to identify and characterize hazardous substances at the Releasing Facility and then to properly dispose of those hazardous substances.  The defendants' duty was a "cradle-to-grave" obligation, and each defendant that relinquished control of the Releasing Facility, knowing full well that it was not in compliance with RCRA, CERCLA, and HWMMA, had an enormous economic incentive to find a successor that would continue its negligent environmental practices.

The evidence establishes that from August 24, 1972 until October 29, 2004, the defendants successively and systematically failed to satisfy their *affirmative* and *continuing* obligations under RCRA, CERCLA, and HWMMA, an environmental history that consistently prompted regulatory and other official concerns.  In 1983, defendant Louisiana-Pacific Corporation assumed control of the Releasing Facility from PACTIV.  Significantly, under RCRA, CERCLA, and HWMMA, defendant PACTIV Corporation remains liable for the improper disposal of hazardous substances on the site of the Releasing Facility, and defendant Louisiana-Pacific Corporation did nothing to force defendant PACTIV Corporation to clean up the site.

In furtherance of their conspiracy, the defendants also failed to communicate to the citizens of Lockhart and Florala, a protected class of people (see preceding section on negligence per se), that the defendants were releasing hazardous substances from the Releasing Facility at extraordinarily high levels that were thereby creating serious health risks to the Plaintiffs.  See Exhibit "D", *Affidavit of Paul Rosenfeld, Ph.D.*

Under *United States v. Hansen*, 262 F.3d 1217, 1246 (11th Cir. 2001), these facts are sufficient to establish not only that each defendant is individually liable for violating RCRA, CERCLA, and HWMMA, but also that there was a "meeting of the minds," a conspiracy, to violate those statutes.  The key to the conspiracy is the *affirmative* and *continuing* nature of the defendants'

obligations under RCRA, CERCLA, and HWMMA, and it is because of the defendants' failure to satisfy those obligations that an agreement or meeting of the minds may be inferred.  Defendant PACTIV Corporation relinquished control of the Releasing Facility, knowing full well that it had not satisfied its *affirmative* and *continuing* obligations, and PACTIV Corporation therefore had an enormous economic incentive to find a successor that would continue its negligent environmental practices.  It is precisely because of this type of scenario that courts have recognized – even in the *criminal* context – that *an agreement to violate environmental laws*:

> … may be proved by either direct or circumstantial evidence and a common scheme or plan may be inferred from the conduct of the participants or from other circumstances.

*United States v. Hansen*, 262 F.3d 1217, 1246 (11th Cir. 2001), quoting *United States v. Diaz*, 190 F.3d 1247, 1254 (11th Cir. 1999).

Thus, in *Hansen*, the Eleventh Circuit affirmed criminal convictions for conspiracy to commit environmental crimes, including violations of CERCLA, RCRA, and CWA.  In so ruling, the court noted that as a result of the continuing affirmative obligations under those statutes, a conspiracy could include actions taken by individual conspirators at different times in connection with the same facility:

> Each party to a continuing conspiracy may be vicariously liable for substantive criminal offenses committed by a co-conspirator during the course and in furtherance of the conspiracy, notwithstanding the party's non-participation in the offenses or lack of knowledge thereof.

*Id.*, quoting *United States v. Mothersill*, 87 F.3d 1214, 1218 (11th Cir. 1996).

The Eleventh Circuit also ruled that it is not even necessary to establish that each conspirator knew all of the details of the conspiracy, and that an individual conspirator may be liable even if he played only a minor role:

> It is unnecessary for the government to prove that each conspirator participated in all aspects of a conspiracy, knew each phase or every detail of the conspiracy, or knew all of the participants.

*Id.* at 1247, citing *United States v. Pedrick*, 181 F.3d 1264, 1272 (11th Cir. 1999).

A defendant may be convicted of conspiracy if he joined the conspiracy after its

inception and played only a minor role within it, [*citation omitted*] and he is presumed to be a part of the conspiracy until all conspiracy activity ceases or he proves that he withdrew.

*United States v. Hansen*, 262 F.3d 1217, 1247 (11th Cir. 2001).

To show withdrawal, a conspirator must show that he "has taken affirmative steps to defeat the objectives of the conspiracy," and "made a reasonable effort to communicate these acts to his co-conspirators or disclosed the scheme to law enforcement officers."

*Id.*, quoting *United States v. LeQuire*, 943 F.2d 1554, 1564 (11th Cir. 1991).

In asking this Court to dismiss Count 6, the defendants refer to cases decided in contexts other than the violation of environmental laws, and in which there was a failure of evidence to support the underlying violation to support a conspiracy. For example, the defendants cite *McLemore v. Ford Motor Company*, 628 So.2d 548 (Ala. 1993), which involved an alleged conspiracy to fraudulently induce the plaintiff to purchase a vehicle damaged in an accident without disclosing the fact of the accident. In stark contrast to the clear violations of RCRA, CERCLA, and HWMMA alleged in this case, the court in *McLemore* struggled with a paucity of evidence to support the existence of the underlying fraud, much less the conspiracy. Similarly, in *First Bank of Childersburg v. Florey*, 676 So.2d 324 (Ala.Civ.App. 1996), the plaintiff alleged a conspiracy to commit fraud in connection with a forged deed. The plaintiff was unable to establish that the alleged "conspirators" had any reason to suspect the forgery, much less any direct involvement in the forgery. In the instant case, the Plaintiffs allege, and the evidence supports a finding, that ***all*** of the defendants were guilty of the underlying wrong, the violations of RCRA, CERCLA, and HWMMA.

The conspiracy was complete and the "meeting of the minds" occurred when each successive defendant knowingly accepted the improper disposal practices of its predecessor and continued the intentional "masking" of environmental non-compliance at the Releasing Facility. Each defendant has imputed knowledge from the continuous and extensive correspondence from the Alabama Department of Environmental Management and the Environmental Protection Agency. That correspondence evidences violations of RCRA, CERCLA, and HWMMA.

The defendants' motion to strike Count 6 is therefore due to be denied.

Page 21 of 29

## Count 7 – AEMLD

In urging this Court to dismiss the Plaintiffs' AEMLD claim, the defendants argue that the Plaintiffs were neither a "user" nor "consumer" as contemplated by the AEMLD. In making this argument, the defendants mistakenly rely upon *Dillard v. Pittway*, 719 So.2d 188 (Ala. 1998), which they cite as supporting the proposition that one who does not actually use or consume a product is not a proper plaintiff under the AEMLD. The holding in *Dillard*, however, is contrary to this premise, for in *Dillard* the court found that a rescuer who had been injured when he entered a burning home was a proper AEMLD plaintiff, notwithstanding the fact that he had neither consumed nor "used" the faulty smoke detector at issue in the case. Indeed, in the very language cited by the defendants, the court in *Dillard* was not limiting the scope of AEMLD plaintiffs, but instead was demonstrating the pervasive reach of the AEMLD. 719 So.2d at 193.

The AEMLD has its origins in two sections of the RESTATEMENT (SECOND) OF TORTS, § 388[11] and § 402A.[12] These sections figured prominently in the Alabama Supreme Court's

---

[11]. § 388. Chattel Known to be Dangerous for Intended Use
One who supplies directly or through a third person a chattel for another to use is subject to liability to those whom the supplier should expect to use the chattel with the consent of the other or to be endangered by the probable use, for physical harm caused by the use of the chattel in the manner for which and by a person for whose use it is supplied, if the supplier
    (a)    knows or has reason to know that the chattel is or is likely to be dangerous for the use for which it is supplied, and
    (b)    <u>has no reason to believe</u> that those for whose use the chattel is supplied will realize its dangerous condition, and
    (c)    <u>fails to exercise reasonable care to inform them</u> of its dangerous condition or of the facts which make it likely to be dangerous.

[12]. § 402A. Special Liability of Seller of Product for Physical Harm to User or Consumer
    (1)    One who sells any product in a defective condition unreasonably dangerous to the user or consumer or to his property is subject to liability for physical harm thereby caused to the ultimate user or consumer, or to his property, if
    (a)    the seller is engaged in the business of selling such a product, and
    (b)    it is expected to and does reach the user or consumer without substantial change in the

announcement of the AEMLD in two companion cases, _Casrell v. Altec Industries, Inc._, 335 So.2d

128 (Ala. 1976) and _Atkins v. American Motors Corporation_, 335 So.2d 134 (Ala. 1976). In _Casrell_,

a widow brought a wrongful death action for her husband's accidental electrocution while standing

next to a truck with a telescoping arm that came into contact with electric power lines. The widow

claimed that the truck was defective because neither the truck nor its telescoping arm was insulated

despite their foreseeable use in connection with the maintenance and repair of high tension electric

power lines. In rendering its decision, the Alabama Supreme Court made the following observation:

> The historical and traditional purpose of tort law has been to protect persons against
> unreasonable risks. The only real difference between strict tort liability and the
> traditional negligence theory in products liability cases is that those courts which
> have adopted the rule of strict liability _look to the dangerous characteristics of the_
> _end product_, rather than the methods or processes by which it was produced. This
> represents a shift in emphasis from the manufacturer's, or seller's, conduct to the
> performance of his product. However, the results are the same, viz., the defendants
> must pay the consequences of placing an unreasonably dangerous or defective
> product on the market. If a product is unreasonably dangerous, it is necessarily
> defective and the consumer should not be required to prove defectiveness as a
> separate matter.

335 So.2d at 131, _emphasis added_.

It is significant that we are directed to look at the dangerous characteristics of the end

product, for this is the manner in which the foreseeable "users" and "consumers" are to be identified.

The essence of an AEMLD case is the "unreasonably dangerous" nature of the product. "Under the

'extended manufacturer's liability doctrine,' we opine that a manufacturer, or supplier, or seller, who

markets a product not reasonably safe when applied to its intended use in the usual and customary

manner, constitutes negligence as a matter of law." 335 So.2d at 132. Moreover, "[w]hether a

product is 'unreasonably dangerous' is for the trier of fact, just as negligence, _vel non_, is in a

---

condition in which it is sold.
(2)     The rule stated in Subsection (1) applies although
     (a)     the seller has exercised all possible care in the preparation and sale of his product, and
     (b)     the user or consumer has not bought the product from or entered into any contractual relation
with the seller.

traditional negligence case." 335 So.2d at 133.

*Atkins v. American Motors Corporation*, 335 So.2d 134 (Ala. 1976) was brought by the widow of a man who died as a result of injuries he sustained when the passenger compartment in the automobile he was driving, a 1970 Gremlin, filled with burning gasoline after being struck from the rear by another vehicle. The widow contended that the vehicle was defective because its fuel tank was inadequately protected and therefore susceptible to penetration. After reviewing the historic development of product liability law in the United States, the Alabama Supreme Court expressly rejected a no-fault concept of product liability for Alabama. Instead, the Court adopted a unique approach:

> Because our holding rejects the no-fault strict liability concept of the Restatement, we deem it appropriate to reemphasize that our retention of the fault concept is to be treated in the context of a defective condition, which renders the product unreasonably dangerous or unsafe when put to its intended use, rather than in the context of traditional notions of negligence law.
>
> The gravamen of the action is not that the defendant failed to exercise due care in the manufacture, design, sale or placing in the commercial stream a defective product; rather, the gravamen of the action is that the defendant manufactured or designed or sold a defective product which, because of its unreasonably unsafe condition, injured the plaintiff or damaged his property when such product, substantially unaltered, was put to its intended use.

335 So.2d at 139, *emphasis added*.

RESTATEMENT § 402A removes the requirement that plaintiff and defendant in a product liability case be "in privity" with one another. Thus, a product manufacturer may be held liable to all of those whose injury by the product is reasonably foreseeable, and not just those with whom the manufacturer is in privity. In *Atkins*, the Alabama Supreme Court credited the legislature with having made the preliminary move in this direction by modifying the UNIFORM COMMERCIAL CODE to extend the seller's warranty to the ultimate user of a product: "American Motors argues that these changes were not meant to imply the adoption of strict tort liability. We agree; but it is an indication of the legislature's recognition that the old privity shield against liability was no longer to be tolerated in this State." 335 So.2d at 141. The Alabama Supreme Court has never evidenced an intent to overrule these two cases.

Thus the Plaintiffs' exposure to the dangerous firewood product placed into the stream of commerce by the defendants falls squarely within the analytical framework of the AEMLD, and it is not necessary, as the defendants contend, to show actual use. This is abundantly clear even in *Dillard*, the case upon which the defendants rely, for the plaintiff in that case neither consumed nor used the smoke detector at issue in the case.

In urging this Court to dismiss the Plaintiffs' AEMLD claim, the defendants also argue that the defendants were not "in the business" of selling firewood. This is simply not true. Both defendants operated a retail lumber and supplies store (see *Florala News*, Exhibit "I"). Affidavits from former employees and residents of Lockhart and Florala detail the systematic and regular sale of scrap wood to employees and to members of the community for use as firewood. These affidavits establish a frequency and duration of sales that made such sales a regular part of the defendants' business.

Because the lumber produced at the Releasing Facility was required to be of exact length and because the drying process caused shrinkage in the wood, each board was intentionally cut longer than necessary in order to allow for the shrinkage. The excess was cut off after the drying process, and rather than treat the scrap as waste, the defendants made it a separate product. It is important to note that the defendants' sales of scrap wood were neither sporadic nor limited in duration. The defendants nevertheless ask this Court to unduly restrict the scope of "business" to exclude the sale of ***any*** by-products, no matter how regularly such sales occurred.

In support of this contention, the defendants cite *McGraw v. Furon Company*, 812 So.2d 273 (Ala. 2001) and *Baugh v. Bradford*, 529 So.2d 996 (Ala. 1998). Both *McGraw* and *Baugh* involved the sale or lease of a single used machine that ultimately injured the plaintiff. In each case the defendant was not the manufacturer of the equipment, nor did the defendant regularly sell or lease such equipment. Instead, each defendant had sold or leased the injury-causing equipment just one time. In *McGraw* the defendant sold an old machine that it was no longer using in its own manufacturing operations. In *Baugh*, the defendant leased one of its machines to a business that could not afford to purchase its own equipment. In contrast to both *McGraw* and *Baugh*, the defendants in this case actually manufactured the product at issue – their scrap firewood – and sold it on a regular basis. Indeed, the frequency and duration of the defendants' sales of scrap wood make

Page 25 of 29

their assertion that they were not in the business of selling scrap wood a ludicrous assertion.

The defendants' motion to strike Count 7 is therefore due to be denied.

## Count 9 – Spoliation of Evidence

The defendants ask this Court to dismiss Count 9 (Spoliation) and argue that Alabama does not recognize a cause of action against another party in litigation based upon spoliation of evidence. The Plaintiffs agree to the dismissal of Count 9, but incorporates the allegations of Count 9 in support of the remaining counts. The Plaintiffs intended to provide the defendants with notice that the Plaintiffs will seek the benefit of Alabama law governing the destruction of potential evidence by an opposing party. Such notice is required by _Choice Builders, Inc. v. Complete Landscape Services_, 2006 Ala.Civ.App. LEXIS 164.

Because of the excessive amount of hazardous waste generated and stored at the Releasing Facility, that facility is a "large quantity generator" ("LQG"). Indeed, documents generated by the defendants clearly indicate that they knew that the Releasing Facility was an LQG. As an LQG, the Releasing Facility was subject to state and federal recordkeeping and reporting requirements, including, without limitation, those set forth in 40 CFR §§ 264.1, 264.70, 264.73, 264.74, and 264.75. These regulations required the defendants to maintain records documenting every phased of the generation, storage, and disposal of hazardous waste. These records would certainly be germane to establishing that the defendants' violated RCRA, CERCLA, and HWMMA.

According to two affidavits – one from a former employee (Exhibit "J", _Affidavit of Carlton Dukes_) and one from a garbage collector (Exhibit "K", _Affidavit of Connie Wayne Adams_), a team began destroying documents at the Releasing Facility just one week after the Plaintiffs' counsel provided the defendants with recorded statements concerning the illegal environmental practices employed by the defendants. The law regarding spoliation of evidence is well settled in Alabama. Spoliation is an attempt by a party to suppress or destroy material evidence favorable to the party's adversary. _May v. Moore_, 424 So.2d 596 (Ala. 1982); _Wal-Mart Stores, Inc. v. Goodman_, 789 So.2d 166 (Ala. 2000). A finding of spoliation results in presumptions in favor of the aggrieved party:

As a general rule, if the trier of fact finds a party guilty of spoliation, it is authorized

to presume or infer that the missing evidence reflected unfavorably on the spoliator's interest. [*citations omitted*]. Spoliation "is sufficient foundation for an inference of [the spoliator's] guilt or negligence." [*citations omitted*].

*Vesta Fire Insurance Corporation v. Milan & Company Construction, Inc.*, 901 So.2d 84 (Ala. 2004). Under Alabama law evidence that the defendants in this case destroyed documents is admissible to establish the defendants' guilt, and the Plaintiffs are entitled to have the jury so instructed:

> In this case, the plaintiff claims that the defendant is guilty of wrongfully destroying, hiding, concealing, altering, or otherwise wrongfully tampering with material evidence (including attempts to influence a witness's testimony). If you are reasonably satisfied from the evidence that the defendant did or attempted to wrongfully destroy, hide, conceal, alter, or otherwise tamper with material evidence, then that fact may be considered as an inference of defendant's guilt, culpability, or awareness of the defendant's negligence.

ALABAMA PATTERN JURY INSTRUCTION 15.13, Spoliation of Evidence – Defendant.

Sanctions "for failure to comply with a request for production may be warranted even if no discovery was pending or litigation was pending at the time the evidence was destroyed. *Vesta Fire Insurance Corporation v. Milan & Company Construction, Inc.*, 901 So.2d 84 (Ala. 2004).

## Count 10 – Homicide

The Plaintiffs agree to the dismissal of Count 10.

WHEREFORE, PREMISES CONSIDERED, the Plaintiffs pray that this Honorable Court will deny the defendant's motion to dismiss and deny defendants' motion for more definite statement.

_/s/ W. Eason Mitchell_
W. EASON MITCHELL (MIT020)
The Colom Law Firm, LLC
Post Office Box 866
Columbus, MS 39703-0866
Telephone: 662-327-0903
Facsimile: 662-329-4832
emitchell@colom.com


_/s/ Gregory A. Cade_
GREGORY A. CADE (CAD010)
Environmental Litigation Group
3529 Seventh Avenue South
Birmingham, AL  35222
Telephone: 205-328-9200
Facsimile: 205-328-9206


_/s/ Robert Leslie Palmer_
ROBERT LESLIE PALMER (PAL007)
Environmental Litigation Group
3529 Seventh Avenue South
Birmingham, AL  35222
Telephone: 205-328-9200
Facsimile: 205-328-9206

## Certificate of Service

I, W. Eason Mitchell, hereby certify that on April 24, 2006, I electronically filed the foregoing *Plaintiff's Response to Defendants' Motion to Dismiss* with the Clerk of the Court using the ECF system which sent notification of such filing to the following:

      H. Thomas Wells, Jr., Esq.
      John A. Earnhardt, Esq.
      Dennis R. Bailey, Esq.
      R. Austin Huffaker, Esq.

                        /s/ W. Eason Mitchell
                    W. Eason Mitchell

47421.wpd