CLOSING MEMORANDUM

Purchase of all the stock of Dixon Lumber Company, Inc., and transactions related thereto.

## Definitions

| | |
|---|---|
| Company | TD Lumber Company |
| Dixon | Dixon Lumber Company, Inc. |
| Conecuh | Conecuh Lumber Company, Inc. |
| Subsidiaries | Wholly- and partially-owned subsidiaries of Dixon |
| Tenneco Corporation | Tenneco Corporation |
| Edwin McIntyre | Edwin McIntyre |
| Shareholders | Shareholders of Dixon |
| Escrow Agent | First Alabama Bank of Montgomery, N.A. |
| Dixon Agreement | Agreement with the Shareholders for the purchase of all the issued and outstanding shares of stock of Dixon |
| McIntyre Agreement | Agreement with Edwin McIntyre for the purchase of 150 of the issued and outstanding shares of stock of Conecuh |

## The Closing

The Closing took place at the offices of the Escrow Agent in Montgomery, Alabama, on Thursday, January 19, 1978, at 10:00 a.m. The following persons were present at the Closing:

For the Company:

    Mr. Ernest Jett
    Mr. Reed Cecil
    Mr. W. J. Wakefield
    Mr. J. R. Cook, Jr.
    Mr. G. B. Bonfield, Jr.
    Mr. Fred B. Schelhorn
    Mr. J. Wayne Lamberth
    Ms. Dorothy Hopkins



EXHIBIT 4

For Dixon and Conecuh:

    Mr. Tommy Mancuso          Ms. Grover Nell Little Tadlock
    Ms. Catherine Dixon Roland    Mr. Solon Dixon
    Mr. C. M. Jackson           Mr. Grover Little
    Ms. Thelma Dixon            Mr. John E. Vick
    Mr. Terrell D. Little       Mr. Gordon Jones

For Pioneer Title Company:

    Mr. John Huddleston

## Actions Taken at the Closing

1.  A letter from Pioneer Title Company was presented to the Company guaranteeing the issuance of a title binder for the 18,508 acres belonging to the Shareholders and Edwin McIntyre. The Shareholders and Edwin McIntyre paid Pioneer Title Company one-half of the fee for the title examination. The Company paid Pioneer Title Company one-half of the fee for the title examination and the fee for the title binder and for the final title policy.

2.  A letter from Pioneer Title Company was presented to the Company guaranteeing the issuance of a title binder for approximately 7,000 acres belonging to Dixon. Dixon paid Pioneer Title Company for the title examination and for the title binder. The Company paid Pioneer Title Company for the title policy.

3.  Agreements of Sale for the 18,508 acres as required by Section 5(c) of the Dixon Agreement and Section 5(b) of the McIntyre Agreement were executed.

4.  Warranty Deeds conveying the 18,508 acres were delivered to the Company.

5. The Forest Management Agreements relating to approximately 60,000 acres of land as required by Section 5(b) of the Dixon Agreement were executed and delivered. All open terms of a Timber Cutting Contract attached as an exhibit to the Forest Management Agreement were completed.

6. The Shareholders and Edwin McIntyre paid F & W Forestry one-half of its fee for performing an inventory and evaluation of 18,508 acres. The other one-half of the fee was paid to F & W Forestry by T. D. Lumber Company.

7. In accordance with Section 3(e) of the Dixon Agreement, certificates representing the Dixon stock, duly endorsed for transfer or with duly endorsed stock powers, were delivered to the Company along with the Stock Transfer Books of Dixon.

8. In accordance with Section 3(e) of the McIntyre Agreement, certificates representing the Conecuh stock, duly endorsed for transfer or with duly endorsed stock powers, were delivered to the Company along with the Stock Transfer Book of Conecuh.

9. The Shareholders delivered to the Company, pursuant to Section 4(g) of the Dixon Agreement, estoppel certificates from each institution to which Dixon or its subsidiaries are indebted or from holders of liens on properties belonging to Dixon or the Subsidiaries.

10. In accordance with Section 5(a) of the Dixon Agreement, the Shareholders signed and delivered Noncompetition Agreements.

11. In accordance with Section 5(a) of the McIntyre Agreement, Edwin McIntyre signed and delivered a Noncompetition Agreement.

12. An Opinion of Counsel from Robison, Belser, Brewer & Mancuso, counsel for the Shareholders, was delivered to the Company in accordance with Section 5(e) of the Dixon Agreement.

13. An Opinion of Counsel from Robison, Belser, Brewer & Mancuso, counsel for Edwin McIntyre, was delivered to the Company in accordance with Section 5(c) of the McIntyre Agreement.

14. Certificates regarding the absence of liens, encumbrances or adverse claims, signed by the President and Treasurer of Dixon (along with similar certificates from each of the Subsidiaries) were delivered to the Company in accordance with Section 5(f) of the Dixon Agreement.

15. Officers Certificates were delivered to the Company in accordance with Section 5(h) of the Dixon Agreement and 5(e) of the McIntyre Agreement.

16. Shareholder Certificates updating to Closing the representations and warranties of the Shareholders and Edwin McIntyre were delivered in accordance with Section 5(i) of the Dixon Agreement and Section 5(f) of the McIntyre Agreement.

17. Resignations, requested by the Company, of officers of Dixon and the Subsidiaries were delivered in accordance with Section 5(k) of the Dixon Agreement and Section 5(h) of the McIntyre Agreement. New directors of Dixon and the Subsidiaries, as specified by the Company were elected and took office.

18. An Alabama estate tax waiver was delivered to the Company certifying that the shares conveyed by the estate of Charles Dixon are free and clear of all estate tax liens. Tom Mancuso delivered

4

to the Company a letter stating that the estate of Charles Dixon contains assets (other than the Dixon stock) which are sufficient for the payment of all federal and State estate taxes.

19. The Company, in accordance with Section 6(c) of the Dixon Agreement, delivered a letter agreement to indemnify Shareholders who have guaranteed loans to Dixon or the Subsidiaries by the Federal Land Bank.

20. An Opinion of Counsel for the Company was delivered to the Shareholders in accordance with Section 6(d) of the Dixon Agreement and to Edwin McIntyre in accordance with Section 6(d) of the McIntyre Agreement.

21. The Company wired to First Alabama Bank of Montgomery $17,030,771 which amount was paid to the Shareholders pursuant to Section 3(b) of the Dixon Agreement.

22. The Company wired to First Alabama Bank of Montgomery $1,419,229 which amount was paid to Edwin McIntyre pursuant to Section 3(b) of the McIntyre Agreement.

23. The Company paid an amount not to exceed $12,956,000 to certain shareholders and Edwin McIntyre for 18,508 acres of timberland in accordance with a Purchase and Sale Agreement. For Edwin McIntyre and certain Shareholders who so elected, 10% of the amount due for said 18,508 acres was wired to First Alabama Bank of Montgomery for their account. The Company delivered promissory notes for the remaining amount due to Edwin McIntyre and certain Shareholders, which promissory notes were payable on June 19, 1979, and were secured by guarantees delivered by Tenneco Corporation.

5

24. The Shareholders and Edwin McIntyre entered into Escrow Agreements with the Escrow Agent, and signed the Escrow Agreements substantially in the form of Exhibit F to the Dixon Agreement and Exhibit A to the McIntyre Agreement.

25. The Shareholders and Edwin McIntyre deposited certain funds into Escrow in accordance with the Dixon and McIntyre Agreements and the Escrow Agreements attached thereto.

26. The Company executed and delivered promissory notes to certain Shareholders who elected to be paid for their Dixon stock in installments, and paid to said Shareholders at Closing 25% of the portion of the purchase price allocable to said Shareholders in accordance with Section 3(b)(ii) of the Dixon Agreement.

27. Tenneco Corporation delivered letters guaranteeing the promissory notes for the remaining amount due for the purchase of the Dixon stock.

28. Certificates of Good Standing from the State of Alabama and Certificates from the Alabama Department of Revenue stating that all current taxes have been paid for Dixon and D & D Lumber Company, Inc., were delivered to the Company. Bringdown Certificates were supplied for Dixon and the Subsidiaries.

29. A letter was delivered to the Company from the President of D & D Lumber Company, Inc., explaining the minutes missing after August 16, 1972.

30. A letter was delivered to the Company from the President of Conecuh explaining the missing minutes from 1962 to October 13, 1971.

31. Confirmation of all bank accounts and balances therein of Dixon and the Subsidiaries as of December 31, 1977, and the

reconciliation of the various bank statements was made with the books of Dixon and the Subsidiaries as of December 31, 1977.

32. A letter from Gordon Jones waiving all rights to an option extended to him on June 1, 1962, to purchase 10% of any future issue of the stock of Dixon was delivered to the Company.

33. Affidavits were delivered to the Company from Richard W. Insley for 2 shares (Certificate No. 14), Mary Robinson for 5 shares (Certificate No. 12), and Eleanor R. Insley for 3 shares (Certificate No. 13) of D & D Lumber Company, Inc., which affidavits stated that said shares were returned to D & D Lumber Company, Inc.

34. The Mortgage held by Mrs. Dixon on the plywood mill was paid off.

## After the Closing

When the Mortgage held by Mrs. Dixon is paid off, a termination Statement will be secured by Mr. Mancuso from the Secretary of State of Alabama as to the UCC Filing and from the Judge of the Probate Court overseeing the estate of Mr. Charles Dixon.